Good morning, Your Honors. My name is Aaron Olanieczak for the appellant Nature's Way Products, LLC. With me today are my co-counsel, Christopher Lerow, and general counsel for Nature's Way, Tara Falsano. May it please the Court, I'd like to reserve approximately five minutes for rebuttal. My client's direct competitor, Doctors Best, recently adopted a confusingly similar name, Nature's Day 4 Products. This is a direct attack on my client's long-established rights and its Nature's Way trademarks. Doctors Best originally brought this suit to inappropriately use the court system to secure U.S. registration rights for Nature's Day. Doctors Best is seeking to have this court conduct a likelihood of confusion analysis that ignores Doctors Best's domestic activity and conflicts with the U.S. determining whether or not... So, let's start there, because you raised it, the domestic activity. Can you tell us... My understanding of the domestic activity is they're manufacturing it in a warehouse in California. It's, I guess, going on a truck or an airplane or somewhere and being shipped overseas, but never is being sold to a U.S. consumer. Is that accurate? Well, Your Honor, that is something that we have not been able to test at the district court level because Nature's Way was denied the full benefit of the discovery period and discovery was cut short. But discovery, so you did get discovery? We did not get a chance to test the discovery. Did you initiate discovery when you had the opportunity to? We did initiate discovery well within the court's scheduled discovery schedule. Is there anything in the district court's scheduling order that said you can't bring a summary judgment motion until after the discovery period is closed? No, Your Honor, there's nothing that says that. What we argued was that it was an early request for summary judgment and that we needed more time to conduct discovery to test the... What discovery did you take? At that point, we had not taken any discovery because there were still four months left in the discovery period. How long did you have before they filed their motion for summary judgment to initiate any discovery? I believe it was approximately a month. Only one month they filed that fast? Yes, Your Honor, and in the meantime, what I believe is important to this court to understand is that there are multi, extra-jurisdictional events happening. There was an opposition before the U.S. Patent and Trademark Office that Nature's Way filed. There's also an opposition in Europe before the European Trademark Office to oppose Nature's... Dr. Best's registrations for Nature's Day in those jurisdictions. What we were attempting to do... Has that been resolved? That has not been resolved, no, Your Honor. Both are stayed right now pending the issue here before this court. What we expect is that particularly the U.S. PTO will take direction from this court as to whether or not there needs to be further proceeding. When you sent the letter demanding that they stop using Nature's Day, you had no information whether or not the products are being sold or distributed within the United States? What we had at that time, Your Honor, was an application by Dr. Best to the United States Patent and Trademark Office for registration of the mark Nature's Day. That was an intent-to-use application. What we asked Dr. Best to do was to abandon that application because we believed it infringed on our 65-plus years of use of the Nature's Way mark. What that was met with, Your Honor, was a declaratory judgment lawsuit in the Central District of California, essentially arguing that our allegations of saying that there would be confusion by their filing of the trademark application, that that is somehow actionable by the district court. In response to that, Nature's Way filed a motion to dismiss. In response to that motion to dismiss, then at that point, Dr. Best said, oh, by the way, we are using this and we are beginning to manufacture here in California. That got them out of this initial argument that they started with the lawsuit. But then they eventually submitted a declaration, I guess, in support of their motion for summary judgment where they said, we don't intend to sell this product in the United States. It's only for overseas. And that's fair, but that's not the test, Your Honor. So the test for the application of the Lanham Act, as set forth in the Abitrine case recently by the Supreme Court in 2023, is that there must be some domestic use of the infringing mark in the United States. And also, they're... And Abitrine is due to assert protection. They want to use it... No, for you to assert protection, for you to get the benefits of the trademark law. For us to get the benefits... There has to be some domestic use in commerce. And for Dr. Best to secure the Nature's Way, or the Nature's Day mark. And the district court focused on no likelihood of confusion because the only domestic use was transporting it in the country, and it wasn't sold to consumers. Isn't that correct? That's my understanding. I believe, Your Honor, what you're asking is their manufacturing, transportation, and distribution from the U.S., is that sufficient use? To Asia, yeah. Yes. That use is what Abitrine says is sufficient use. Right. But the district court was focusing on no likelihood of confusion, if obviously craft factors or some three of them, I think, because it was all being used overseas. And Abitrine said Lanham Act, it doesn't apply extraterritorially. Your Honor, that is not what Abitrine says. That is what the rejected concurrence from Justice Sotomayor says. What Abitrine says is that it's setting a threshold test about whether or not the Lanham Act applies to certain activities. And what Abitrine says is that if there are any of the uses under the Lanham Act, which includes manufacturing, which includes distribution, which includes other things, including selling, then you have liability, or potential for liability. You have to go through the sleep test. Everybody agrees, it seems like, that under Abitrine, the Lanham Act applies. The question is, what does it apply to? It doesn't apply to selling, because the selling is occurring overseas. It applies to manufacturing and transportation. You don't disagree with that? And distribution. Well, isn't distribution the same thing as transportation? Yes, I would say that, Your Honor. So, I mean, I really don't understand your argument, how there could be consumer confusion when it's not even sold in the U.S. Now, your argument seems to be, well, we didn't get a chance to pressure test this affidavit. That's a separate issue, but that's reviewed under abuse of discretion. But start with the first question. How is there consumer confusion if it's not sold? Okay, so the court, this Ninth Circuit, looks at a number of types of confusion. There is point-of-sale confusion. There is pre-sale confusion, and there's also post-sale confusion. So, for example, let's say that Coca-Cola, a competitor of Coca-Cola, decides it's going to manufacture imitation Coca-Cola product here in the U.S. It's going to distribute that imitation Coca-Cola product to Canada and sell it in Canada. Well, the only recourse under the paradigm that the district court set out and that Drs. Best sets out then would be for Coca-Cola to sue in Canada. The effect of that would be that Coca-Cola could only sue in Canada but couldn't reach the activities that are happening here in the U.S. Well, that depends on Canadian law, but the problem you have is there's nothing domestically done. I mean, okay, is there an example that they are using a truck that has the logo blasted on it? We don't know. We have not had the chance for discovery on that, Your Honor. So you had a chance. Let's see, they filed suit, Drs. Best filed suit in May, and in September they filed declaration asserting no U.S. sales, and then a scheduling order was entered in September, and then in December, Drs. Best filed a notice of intent to file a motion for a summary judgment. So there was certainly some time. There was some time, but we were faced also with a June 20, I believe it was June 2024, discovery deadline. So in February, the opposition supporting evidence from Rule 50-60 motion was failed, and then in March, the district court granted a summary judgment motion. So there was quite a length of time at least to come up with something that might support your claim, and the district court said, well, they didn't come up with anything that would lead to, even lead to further evidence on this point. Well, and I believe that was errored by the district court for not allowing us the full scope of the discovery period to conduct that activity. So if we said that the district court didn't abuse its discretion, in fact, you had enough time to come up with discovery, does that mean you lose? No, I disagree, Your Honor. How do you not lose if you agree with the district court that it didn't abuse its discretion in entering the motion for the grand summary judgment? Because there's another factor that goes into the error at the district court, and that error was the fact that they weighed the sleek craft factors. And in fact, that is, it's axiomatic that when reviewing a motion for summary judgment, that the district court must not weigh the evidence. That's the Summers case, 127 F3D 1150 at 1152. That premise has been cited with approval recently by this court in In-Re-Fu and also by Velasquez. Your argument is it weighed the evidence. There wasn't any evidence. Isn't that the whole point? It weighed the evidence that it had that was submitted directly by Drs. Best without a chance for us to submit rebuttal evidence. And we believe that. Well, you had the chance to submit rebuttal evidence. You just didn't seize upon it. We had approximately three, four months left in the discovery period, Your Honor, in order to do that. You want to save some time for rebuttal? Yes, Your Honor. Thank you. Good morning. May it please the Court, Warren Bleeker for the plaintiff and appellee, Drs. Best. I guess I'll start with addressing the abitron. So the Court held plainly in abitron that under the Lanham Act, the Lanham Act provisions are not extraterritorial. And they extend only to claims where the claim to infringing use is domestic. So the first step is to determine whether the statute is extraterritorial. The Lanham Act is not. And then the second step is to resolve whether the suit seeks permissible domestic or impermissible foreign application of the provision. And that's exactly what the district court did in this case. You've sought a trademark application in the U.S., correct? Yes. Why have you done that? Based on the use in the U.S., which as was discussed. The transportation. Well, there's manufacture and there's transportation. That's use under the Lanham Act. But that, okay, so but you, that does not, that's not an indication that you plan to sell it in the U.S.? Correct. Would you agree that if you did change your mind in the future and you started to sell it in the U.S., they could bring a claim against you and you would not be arguing preclusive effect of this decision? It would depend on what they alleged. But if the allegation was there are now direct sales in the U.S., that was not at issue in this case. And so, so if there were then direct sales in the U.S. and they were to file a new suit, at least that portion of it likely would not be covered by this case because this case dealt only with sales outside the United States. Is there any advertising going on online? Not in the United States, no, Your Honor. The facts were that the point all along was to develop this for the Asian market. And so it was only advertised and sold to consumers outside the United States in Asia. So when you apply for, help me out on the specifics. When you apply for a trademark in the U.S., can you distinguish between manufacturing and sales on the use of the trademark? There just has to be a good faith use in commerce in the U.S. But you don't have to distinguish. You don't have to indicate this is only a trademark for manufacturing versus this is a trademark for selling? That's my understanding is when you file, I think when the intent to use application was filed, you just have to have a bona fide intent to use the mark in commerce in the U.S. But you don't. I don't think you delineate. It's, you know, the type of use. It just has to be a good faith basis for use. So going back to Abitron, the decision is fairly clear that if the conduct relevant to the focus occurred in a foreign country, then the case involves impermissible extraterritorial application, regardless of any other conduct that occurred in the U.S. territory. So after Abitron, that case was remanded back to the Tenth Circuit. And on remand, the Tenth Circuit held that because the court now requires infringing conduct in domestic commerce to anchor any Lanham Act claim, a party cannot be liable for sales to foreign customers under Lanham Act. So that's now the law of the Tenth Circuit, which is basically what the way that the district court applied it in this case. Here, the district court properly employed the two-part Abitron test, identified there is domestic use. But the domestic use consisted of only manufacturing and shipping. That use didn't create a likelihood of confusion to consumers. And so that fell without outside the Lanham Act. Is there any case that has held that manufacturing and transportation can create confusion? It almost seems to me that you have to have a sale to create confusion. But I guess theoretically, you could use the mark enough, like if you had trucks that had the mark, you know, in theory, I guess you could build up a claim for confusion. But it seems like it would be hard. Are there cases that say you can have confusion when it's just manufacturing and transportation? I haven't seen a case that the focus is just on manufacturing and transportation. Usually, there's some sort of advertising element, like there's a trade show or there's a billboard or something that would target a U.S. consumer that would display the allegedly infringing mark to the U.S. consumer. Theoretically, if they're putting the mark on the truck and they were driving it from L.A. to New York, you know, to ship it out, that could theoretically. Theoretically, yeah. I mean, you could, I guess. There's no evidence that that was happening. No, I mean, you could manufacture or transport in a way that you're also advertising, then potentially that would raise an issue. But again, the facts of this case, the manufacturing was at a private facility and it was shipped privately overseas and that there was no evidence that any U.S. consumer was ever exposed to the marks on the products themselves. How about the argument that the desert court cut the discovery period and issued its order in March when the discovery was set to end in June? Didn't that unfairly deprive opposing counsel of the ability to get information that would support its claim? No, Your Honor. I think Your Honor had the timeframe correct, the timeline correct, which was the parties met and conferred before the scheduling conference at some point in September of 2023, which then opened the discovery period. So discovery opened around mid-September of 2023. On September 11th, even before that, is when we had filed our opposition to their motion for a preliminary injunction in which we had submitted all three declarations saying the products are only sold overseas. There's no intent to sell the product in the U.S. There's no evidence of any confusion. There's no evidence of any advertising or sales. So they knew of those declarations early September. Discovery opened mid-September. October is when the district court entered its opinion denying their motion for a preliminary injunction in which the district court held that there was no chance of a likelihood of confusion because the sales were overseas. That was October. So December 28th, I initiated the meet and confer process for the motion for summary judgment, indicated we'd be filing a motion for summary judgment on those same grounds, no likelihood of confusion because the sales are overseas. We met and conferred in early January. They indicated they would oppose the motion. Then we had further discussions in which we stipulated to a briefing schedule. Under the central district local rules, you would only get one week to do an opposition and one week to do a reply. So we negotiated. So we each got two weeks. So we negotiated when their opposition would be due, which was in mid-February of 2024. And at no point in time did they say, oh, hold on, you know, we need more discovery. We can't do an opposition. They never raised that during the meet and confer. They never raised it with the court. They, in fact, stipulated to a briefing schedule. So we filed our motion in January. They filed their opposition in February. So it was after February when they filed their opposition. Then they served discovery after their opposition was already due. So, you know, I believe they had, I think it was. And you not responded to that discovery because you haven't had an obligation to? Right. Then the court entered judgment, I think, before the responses were due. And so, yeah, there was no response to that discovery. So they didn't say we want to take the deposition of these people who submitted affidavits. They served written discovery. They never served any deposition notices. They never even asked for dates for the witnesses that we had identified back in September. And then again, and there's the same three witnesses in support of the summary judgment motion.  And so it was not an abuse of discretion for the court. So the discovery issue, there's two bases for the court's district court opinion. One is that they weren't diligent. And the court cited to the Rosebud case, which is a federal circuit case. And the facts there were pretty similar. The district, the whole thing was the district court did not abuse its discretion in granting summary judgment before the close of discovery. Adobe was the moving party. It indicated it was going to file an early motion for summary judgment before the discovery period closed. And in that case, the other side, Rosebud, they didn't oppose the request or indicate at the time they needed more discovery, which is the same thing that happened here. When we, you know, we met and conferred, here's our motion for summary judgment. They even stipulated to a briefing schedule. They never asked the court for more time to conduct discovery. And then also in the Rosebud case, Rosebud didn't serve any discovery until after it received the summary judgment motion. Here, they didn't serve any discovery until their opposition was already due. And so the facts are very similar to Rosebud and, you know, that's persuasive authority that the district court did not abuse its discretion in arriving at the conclusion that they weren't diligent in conducting discovery. But then the second basis for the district's court's opinion is that the declaration of additional discovery that was needed was inadequate and didn't meet the standard. And so that's a separate basis the court had to exercise its discretion to deny discovery. What was wrong with the declaration? So the requirement is that you have to identify facts that you would take in discovery. And then you have to explain how the facts exist. And then explain how these facts are essential. So the declaration they submitted, it basically listed the topics of discovery. So they said, well, we want to find out where you sell your products. We want to find out who are your suppliers. It didn't say, you know, we believe you are selling in the U.S. or we believe you're advertising in the U.S. And so even, they didn't even identify specific facts that would have changed the outcome. But then the second point, the second factor or element is you have to explain how the facts exist. And the only thing in the declaration was that, well, on information and belief, the facts exist. And the court said, well, it has to be more than speculation. Here would be, the facts that would exist would be you're openly selling this product to consumers in the U.S. It's not even like they needed discovery from Drs. Best. It would be public records. I mean, if Drs. Best was selling this at Walgreens or was selling it on the internet or was selling it on Amazon, one would be able to do a public search and find out that there were sales or advertising in the U.S. They never identified any such evidence that they needed to take. And they never gave a non-conclusory basis for saying, you know, these are, we believe these facts exist because of this. So we should have a chance to get these facts. That was completely missing from the declaration. And so the district court held as a secondary basis for denying discovery that they didn't identify the facts that they needed to get and they didn't provide a non-conclusory declaration identifying, you know, explaining that those facts do exist. So it would, you know, I need time to get them. What was the basis for the, the evidentiary basis for the preliminary injunction? Just the application with the PTO? Their, their basis. They sought the preliminary injunction, right? They sought the preliminary injunction. What was their factual basis for? They, they just went through the sleep craft factors and basically said the marks are similar, et cetera. They didn't have any facts to show that they were sold in the U.S. because they weren't sold in the U.S. And so that, that, I mean, they didn't have any, there was nothing in support of there being U.S. sales. So that was obviously our opposition was that the declaration that, yes, these are manufactured and shipped overseas, but they're not advertised or sold to consumers in the U.S. And so that was, I mean, that was a, a large part of the court's denial of the motion for preliminary injunction was that no U.S. consumer was being, had the opportunity to, to, to see the, to see the product or advertising. So there was no chance there would be confusion in the U.S. So if, so the argument there's, that there was domestic commerce, domestic use in commerce, the transportation and manufacturing. Council just argued a few minutes ago that, well, there was a tribal issue effect with respect to, I guess, actual confusion or the other factors that the district court touched on, marketing channels. And what was the other one? District court touched on three. If I remember correctly. That's right. It was product expansion. Likelihood of expansion. Right. And then there's. So, so is there anything to that argument? I mean, what, what's, what's your response to it? That there's really a tribal issue effect. Well, they argued that there were, there was a weighing of evidence, but we disagree. There was no evidence to weigh that the evidence was all undisputed. And so the district court then has to look at the facts, the facts of the case, the undisputed facts and the, each case and determine which sweet craft factors are the most relevant in that case. And I think the Reardon case gives the district court discretion to say, you know, this isn't being counting each, you know, each case has a different fact pattern. And so you have to look at the sleek craft factors and give more weight to the factors as a legal matter, the legal weight to them. And that's appropriate for a district court to do. And that's similarly what's happened in the Abitron case in the 10th circuit. So it went back to the 10th circuit and the 10th circuit. There were basically, it's the same thing where the product was made in the U.S. Some of it was sold to U.S.  So that was, that's not part of Abitron. But the other two buckets were, it was made in the U.S. and sold to customers overseas and that the court, the 10th circuit said under Abitron, that's, there's no liability. And then the third bucket was, it's made in the U.S., sold to a distributor overseas, and then that's resold to U.S. consumers. And the 10th circuit said, that's still not, there's no liability under Lanham Act because it's just the making and using in the, or the making and shipping once it's shipped overseas, the shipping back isn't the, isn't the manufacturer's  So I think the point of that is the 10th circuit was also looking at basically those three factors, the marketing channels and whether there was actual confusion in the United States and whether there was any argument for expansion. And here in this case, there were no facts that supported any of those factors. And all the other ones are just looking at comparing the marks, but it all assumes the consumers in the U.S. actually would see them and there'd be a likelihood of confusion. So it was appropriate for the district court to discount those factors where in this case, the U.S. consumers weren't exposed to the product. Okay. Thank you. You have a couple minutes left for rebuttal. Thank you, Your Honors. First, I'd like to dispel this idea that there is some threshold that a product needs to be sold in the United States for there to be liability for infringement under the Lanham Act. What the Abitron case says is that there's a threshold for whether or not to determine whether the Lanham Act applies. And that is, are there domestic... Can you, I'll ask you the same question I asked opposing counsel. Can you point to any cases where manufacturing and transportation alone were the basis of a successful Lanham Act? Yes, Your Honor. The Bolova case, which is underlies, and albeit it's what the Abitron case addressed, was a similar pattern where there was manufacturing of counterfeit watches in Mexico. And those counterfeit Bolova watches came into U.S. commerce, not because they were sold in U.S. but because they were sold in Mexico and used them here. And people, once watch manufacturers were seeing that these inferior watches were being repaired at a higher rate, Bolova brought an action saying that their brand was being tarnished. And I think that's one of the main point... There at least, I mean, it seems like you had consumers in the U.S. with the product. I mean, I guess at a minimum, what that suggests is if you had foreign consumers bringing the product back into the U.S. But there they weren't manufacturing and selling or manufacturing and distributing in the U.S. like Dr. Asbestos. So without the Lanham Act, what other... My point, Mike, I think everyone agrees that you can take advantage of the Lanham Act for the U.S. domestic activity. The problem you have is the U.S. domestic activity isn't actionable under the Lanham Act. Absolutely it is, Your Honor. I disagree. The domestic activity of manufacturing and distributing can cause liability under the Lanham Act after you weigh the sleek craft factors. And those sleek craft factors, there's seven of them. They have to be weighed. The district court only looked at three and said, oh, those three weigh in favor of Dr. Asbestos. They discounted the five that weigh in favor of us. That's the providence of a jury. That's not the providence of a judge on summary judgment. To get back to Judge Nelson's question, below the case, the watches were causing confusion in the United States, not the manufacturing and  Are there any cases where manufacturing and transportation alone was the basis for Lanham Act liability? Your Honor, I have not looked at that, but I can imagine a scenario. Say Dr's Best is manufacturing, selling their Nature's Day product, selling it in Asia. A person in Asia buys it. They get sick from using it. They call up their niece here in California and say, don't buy that Nature's Way product. It's not a good product. That's confusion here in the U.S. Likewise, that person who gets sick from using a Dr's Best product, a Hey, don't ever buy that Nature's Day product because we think, I think it made me sick. That woman then in the U.S. goes to the store, doesn't see any Nature's Day product, but they see a ton of Nature's Way products. And then they say, oh, this must be the product that she was talking about that we should avoid. You're over time. Do we have any other questions? Thank you, Your Honor. Thank both sides for their arguments. The case of Dr's Best versus Nature's Way products is submitted and we're adjourned for this session. All rise. This court for this session stands adjourned.
judges: PAEZ, IKUTA, NELSON